## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**ISRAEL ELI ROSADO-MEJIAS**,
    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL
SECURITY**,
    Defendant.

Civil No. 20-1438 (BJM)

## OPINION & ORDER

Israel Eli Rosado-Mejias ("Rosado") seeks review of the Social Security Administration Commissioner's ("the Commissioner's") finding that he is not entitled to benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Rosado argues that the administrative law judge ("the ALJ") incorrectly determined Rosado's residual functional capacity ("RFC") because the ALJ failed to properly consider Rosado's use of an assistive device for ambulation, improperly discounted or overlooked evidence regarding Rosado's capacity to ambulate on his own as well as other evidence regarding his physical limitations, and reached a conclusion that was not supported by medical evidence. Docket No. ("Dkt.") 16. Rosado also contends that the ALJ failed to consider Rosado's obesity in combination with his other alleged symptoms and ailments. The Commissioner opposed. Dkt. 20. This case is before me by consent of the parties. Dkts. 4, 5. For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## APPLICABLE LEGAL STANDARDS

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-*

*Pizarro v. Sec'y of Health & Hum. Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health & Hum. Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; see *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Sec'y of Health & Hum. Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At Step One, the

Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At Step Two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At Step Three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in Appendix 1 of the regulations, impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to Step Four, at which point the ALJ assesses the claimant's RFC and determines whether the claimant's impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final Step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At Steps One through Four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rodríguez v. Sec'y of Health & Hum. Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under Step Five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Sec'y of Health & Hum. Services*, 890 F.2d 520, 524 (1st Cir. 1989).

Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Sec'y of Health & Hum. Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following relevant facts are drawn from the transcript ("Tr.") of the record of proceedings at Dkt. 12.

Rosado was born on February 6, 1989 and is currently thirty-three years old. Tr. 316. From October 2015 to May 2018 Rosado served in the army, largely as a part of Human Resources. Tr. 42. Previously he had worked in the shoe industry making boots. *Id*. He had a Bachelor's degree in nursing. Tr. 44.

On September 13, 2017, an MRI revealed mild to moderate facet degenerative changes in Rosado's upper and lower lumbar spine, but otherwise Rosado's results were essentially normal other than a somewhat coronal plane orientation in Rosado's lower lumbar facets. Tr. 551.

On February 9, 2018, Rosado had an appointment regarding bilateral knee pain he was experiencing with Dr. Matthew Vanderlugt. Tr. 582. He also reported ankle pain and heartburn. *Id*. His BMI was 30.35. *Id*. Rosado also claimed that there was no specific trauma causing his pain, that the pain was around his kneecap, that he could not stand up from a sitting position without stretching his legs first, and that he had had acid reflux for around six months. Tr. 582. He presented with bilateral knee pain, back pain, knee joint pain, knee joint stiffness, and joint swelling. Tr. 583. Walking and standing up also apparently made his pain worse. *Id*. He rated his pain severity at a three out of ten. *Id*. Despite a knee examination conducted by Dr. Vanderlugt, however, there were no abnormal findings regarding either of Rosado's knees. Tr. 584. His mobility was not found to be limited either and his balance appeared to be normal, as well as his

gait and stance. Tr. 584-85. His range of motion was found to be full and he had five out of five strength in regards to his right knee. Tr. 585.

On February 20, 2018, Rosado saw Dr. Sharon Hitchens. His chief complaint was inadequate sleep. Tr. 575. His pain level was a seven and he appeared as though he was in severe distress regarding his mental well-being, mild distress regarding his psychological symptoms, moderate distress regarding his life functioning, severe distress regarding his global mental health, and low risk regarding suicide monitoring. *Id*. Dr. Hitchens noted that he potentially had significant PTSD and moderate anxiety symptoms. *Id*. Rosado had wished he were dead within the last month but without the intent of actually killing himself. *Id*. He reportedly slept for less than four hours a night and had difficulty falling asleep, staying asleep, waking up too early, and dealing with nightmares. Tr. 575-76. His physical results were mostly normal. Tr. 576-77.

On February 21, 2018, Dr. Vanderlugt saw Rosado again. Rosado reported sleep terror disturbances including nightmares related to family concerns. Tr. 573. He also reported that his wife had been waking him up because he would gasp for air in his sleep, suggesting that he might have dyspnea. *Id*. He also still had pain in his knees. *Id*. He had no headache but some head symptoms; no objective finding of dyspnea or cough; some back pain; no limited mobility; normal balance, gait, and stance; and his BMI was less than 30. Tr. 574. His other results appear to have largely been normal.

On September 7, 2018, Dr. Luis Gonzalez-Martinez ("Dr. Gonzalez") examined Rosado. Dr. Gonzalez noted that Rosado had been diagnosed on June 1, 2018 with degenerative arthritis of the lumbar spine and lumbosacral strain as well as status post lumbar radiculitis affecting Rosado's sciatic nerve in his right lower extremity. He stated that Rosado complained of constant low back pain and a sensation of numbness in his right leg. Tr. 522. He also reported flare-ups and limitations

with bending forwards, standing, or sitting. Tr. 521-22. Dr. Gonzalez noted that Rosado's range of motion presented as limited with pain in his flexion, extension, and rotation in all directions which led to limitations with his ability to lean forward and dress or undress the lower parts of his body. Tr. 522. There was also objective evidence of tenderness over his lumbar paravertebral muscle. *Id*. Rosado was able to perform repetitive use testing without losing function or range of motion, but Dr. Gonzalez could not say for certain whether pain, weakness, fatigability, or incoordination would significantly limit Rosado's functional ability with repeated use over a period of time or would limit his functional ability with flare-ups. Tr. 524. Rosado also displayed guarding but that this did not result in him having an abnormal gait or spinal contour. Tr. 525. Dr. Gonzalez found that Rosado had five out of five ability bilaterally regarding hip flexion, knee extension, ankle plantar flexion, ankle dorsiflexion, and great toe extension, along with no muscle atrophy; his knee and ankle reflexes and sensory responses were also normal throughout his lower extremities and he had negative straight leg raising tests bilaterally. Tr. 525-27. Rosado used assistive devices to ambulate, including constant use of braces and a crutch or crutches due to his low back and right knee pain. Tr. 527-28. Dr. Gonzalez found that Rosado was limited in his ability to work by his condition but apparently only to the extent that he should not lift more than fifteen pounds. Tr. 528. He closed by finding that although there was evidence of pain on Rosado's passive range of motion testing, there was no evidence of pain when the joint was used in non-weight-bearing activities, and that there was no objective evidence that Rosado had either right or left lumbar radiculopathy at the time. Tr. 529.

On October 29, 2018, Rosado visited the Veterans Affairs Medical Center in San Juan reporting low back pain, right thigh pain, gastroesophageal reflux disease, and occipital headaches. Tr. 500-01. He was taking Omeprazole, Naproxen, and methocarbamol. Tr. 501. He displayed

joint pain and swelling. Tr. 503. At the time, his BMI was 32.7. Tr. 503. None of his other results appear to have been abnormal except that there was some suicidal ideation present. Tr. 506.

On November 7, 2018, imaging was performed on Rosado's knees. Tr. 531. Rosado displayed no bony, articular, or soft tissue abnormalities on either side. *Id*. On the same day imaging was performed on Rosado's lumbar spine; multilevel disc space narrowing with lower lumbar facet hypertrophy was visible, leading to an impression that Rosado had spondylotic changes of the lumbar spine. Tr. 532.

On November 6, 2018, psychologist Dr. Gabriela Llenin-Figueroa noted that Rosado had a generalized anxiety score of fifteen, which was just enough to put him into the "clinically significant" category that merited active treatment for anxiety. Tr. 491.

On December 11, 2018, Dr. Ana Garcia-Perez noted that Rosado had been experiencing non-morbid suicidal ideation over the past two weeks. Tr. 466. At a primary care nutrition follow-up appointment the same day with dietician Mariela Diaz-Santiago, Rosado noted that he was suffering from low back pain, gastroesophageal reflux disease, and pain in his right knee. *Id*. His BMI was 30.4 and he had lost around five pounds since his last visit. Tr. 467.

On December 17, 2018, Dr. Gonzalez examined Rosado again. His findings were largely the same as before. He again noted that Rosado had been diagnosed on June 1, 2018 with degenerative arthritis of the lumbar spine and lumbosacral strain as well as status post lumbar radiculitis affecting his sciatic nerve. Tr. 417. He stated that Rosado had reported flare-ups and noted that he reported having a hard time standing, bending forward, lifting objects from the floor, and ambulating as well. *Id*. He also said that Rosado had limitations with his flexion, extension, and rotation in all directions, stating that Rosado experienced pain in each range of motion. Tr. 418. However, he also found that Rosado did not show evidence of pain with weight bearing. *Id*.

Dr. Gonzalez noted that there was an objective finding of tenderness over Rosado's lumbar paravertebral muscle. *Id*. He also found that there was no evidence that Rosado would be limited by pain, weakness, fatigability, or incoordination with repeated use over time, but noted that his pain could possibly limit him in this regard. Tr. 419. He stated that Rosado displayed guarding but that this did not result in him having an abnormal gait or spinal contour. Tr. 420. Dr. Gonzalez found that Rosado had five out of five ability bilaterally regarding hip flexion, knee extension, ankle plantar flexion, ankle dorsiflexion, and great toe extension, along with no muscle atrophy. Tr. 420-21. He also had normal knee and ankle reflexes and sensory responses throughout his lower extremities as well as negative straight leg raising tests bilaterally. Tr. 421-22. Rosado still used assistive devices to ambulate, including constant use of braces and a crutch or crutches due to his low back and right knee pain. Tr. 422. Dr. Gonzalez said that Rosado's condition impacted his ability to work, but the only resultant limitation he noted was that Rosado should avoid carrying or lifting objects of more than fifteen pounds. Tr. 424. Rosado displayed evidence of pain on passive range of motion testing but no pain when the joint was used in non-weight bearing activity. *Id*. Dr. Gonzalez concluded that Rosado's subjective complaints appeared to outweigh his objective findings, that there was no objective evidence of right or left lumbar radiopathy, that Rosado was not putting in a full effort during his lumbar active range of motion evaluation, and that Rosado could do a sedentary job with light duty precautions, including periods of intermittent standing and sitting and not performing heavy lifting or stooping. Tr. 424-25.

On December 28, 2018, Rosado filled out a function report in which he stated that his ability to work was limited because his lower back hurt a lot and the pain radiated to his right leg, causing him numbness; he claimed to be unable to bend, lift anything heavy, stand or sit for too long, walk long distances, run, or drive as a result. Tr. 91. Rosado also claimed to be susceptible

to migraines that forced him to stay in his room with the lights off, caused him to vomit, and also led to severe earache. Tr. 91, 98. He reported feeling useless and unable to do the things he used to do or provide for his family, leading him to feel depression and anxiety. Tr. 98. Rosado said that he did very little during the day, getting up to eat breakfast, taking his medications with help from his wife, then typically lying down for most of the day because of his pain. Tr. 92. He said he had trouble sleeping due to his back pain and would sometimes cry due to frustration at not being able to do things and because of his anxiety. *Id*. He claimed to lack motivation to do most self-care activities and chores or to be unable to do them due to his condition. Tr. 92-93. He also stated that he only went out for medical appointments and "as needed" and would ride as a passenger with his wife when doing so. Tr. 94. However, he reported being able to shop online and to manage all of his own funds. *Id*. He would also watch television every day but would reportedly not engage in any social activities. Tr. 95. Rosado noted that he had difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentrating, and getting along with others (although he also noted that he had no problems getting along with family, friends, neighbors, or others). Tr. 96. He said that he could lift up to fifteen pounds, but could not stand, sit, or walk for more than ten minutes and would need to rest for two to three minutes after walking for that long. *Id*. He also claimed to lose concentration easily and get upset, but said he could finish what he started, follow written instructions, follow spoken instructions, and get along fine with authority figures. Tr. 96-97. Rosado apparently used crutches, a brace or splint, and glasses and claimed to have been prescribed all of them. Tr. 97. He reported suffering no side effects from the medications he was taking. Tr. 98.

On March 19, 2019, Dr. Angel Egozcue, a clinical psychologist, conducted a clinical interview and mental status examination on Rosado upon referral from the Social Security

Disability Determination Program. Dr. Egozcue noted that Rosado had a mental health history of depression and anxiety, but that he had reportedly never been hospitalized for mental health issues and took prescribed medications for mental disorders. Tr. 797. Rosado apparently had high blood sugar, gout, high cholesterol, lower back condition, radiculopathy, migraines, gastritis, and reflux. *Id*. He allegedly showed inadequate initiative to perform tasks within his condition, but did participate in limited social activities such as going to church on Sundays; he also appeared well-nourished and young for his age, was appropriately dressed although disinterested in his physical appearance, followed conversation appropriately, and showed appropriate behavior, posture, and cooperation during the interview. Tr. 798. He walked with the aid of a brace crutch but did not present unusual features like tremors or slowed, repetitive, or involuntary movements. Tr. 798-99. His mode and affect were adequate, his speech was relevant, logical, and coherent, he spoke in a normal tone of voice, and although he was not spontaneous, conversation flowed adequately. Tr. 799. His thought processes and perceptions were also largely normal. *Id*. Dr. Egozcue found his immediate memory to be adequate, as Rosado was able to repeat four out of five words given to him; his short-term memory was moderate, as he was able to remember three of the same five words after five minutes; his recent memory was adequate; and his long-term memory was well-preserved. Tr. 799-800. His intellectual abilities also seemed normal, though he was unable to describe contemporary social events or happenings; his insight and judgment were also found to be adequate. Tr. 800. Dr. Egozcue diagnosed Rosado with adjustment disorder with depressed and anxious mood. *Id*. He also found that Rosado's prognosis was guarded, that he displayed moderate symptoms of reactive depression, and that he showed poor motivation, adequate insight, and inadequate social interactions. Tr. 800-01.

On March 19, 2019, consultative examiner for the government Dr. Carmen Pinero noted that Rosado did not present with any mental limitations at a teleclaim interview; she found that he was "clear," well aware of time and space, and able to recall most information, and that he also did not seem nervous, impatient, or agitated. Tr. 105. She also noted some of his past mental health-related results and appointments before concluding that he had a mild depressive or anxiety disorder secondary to his physical ailments. *Id*. On April 14, 2019, Dr. Vicente Sanchez, another consultative examiner for the government, reviewed portions of Rosado's medical history before concluding that although Rosado had multiple medically determinable impairments, they would not affect Rosado to the extent he alleged. Tr. 106. The examiners found that Rosado had a severe spine disorder with a secondary non-severe depressive disorder, but that Rosado's limitations were only mild as far as his abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. Tr. 106-07. They also found that he would not satisfy the "C criteria" of Listing 12.04. Tr. 107. However, they acknowledged that he had limitations when it came to understanding and memory; sustained concentration and persistence; social interaction; and ability to adapt; and they noted that his impairments could both be expected to produce his pain or other symptoms and that his statements about the intensity, persistence, and functionally limiting effects of the symptoms could be substantiated by the objective medical evidence alone. Tr. 107-08. The examiners found that Rosado could occasionally lift up to twenty pounds; frequently lift up to ten pounds; stand or walk for a total of four hours; sit for a total of about six hours in an eight-hour workday; was limited in his lower extremities regarding his ability to push or pull and could only do either occasionally; could only climb ramps, stairs, ladders, ropes, and scaffolds occasionally; could balance, stoop, kneel, crouch, or crawl frequently; and had no manipulative, visual, communicative, or environmental

limitations. Tr. 108-09. Based on these findings, the examiners concluded that Rosado was not disabled. Tr. 111.

Rosado requested reconsideration of the findings of the previous consultative examiners for the government, alleging that his symptoms had worsened, but upon review on September 12, 2019, the new examiners confirmed that the previous assessment still applied in full. Tr. 118, 120.

On April 8, 2019, Dr. Luis Rivera-Ramos ("Dr. Rivera") examined Rosado. He began by noting that Rosado's height was six feet, three inches and his weight was 246 pounds. Tr. 804. Dr. Rivera found that Rosado had tenderness to palpation in the lumbar region with associated restricted range of motion. Tr. 805. However, his flexion, extension, lateral flexion, and rotation in his cervical region were all normal. *Id*. He had normal muscle tone, no involuntary movements, no atrophy, and no fasciculations. *Id*. His strength was also deemed to be five out of five across a large range of muscle groups, though he was noted to have impaired sensation to light touch and pinprick on one of his right dermatomes. Tr. 806. He had a positive straight leg raising test at sixty degrees on his right side. *Id*. Dr. Rivera noted that his symptoms and clinical signs correlated with a chronic lumbar pain syndrome with associated right sciatica, that Rosado had mild difficulty walking, and that he should use a lumbar brace and a cane for support, balance, and fall prevention. *Id*. Dr. Rivera also found that Rosado should avoid prolonged sitting or standing positions as well as strenuous activities such as pulling, pushing, bending, straining, or heavy lifting. *Id*. He stated that Rosado's gait was antalgic, that he had a rigid spine, and that he protected his right leg as he walked; he also apparently limped, but had five out of five strength in his lower extremities. Tr. 807. Dr. Rivera noted that he had examined Rosado's gait without an assistive device, that Rosado used a single "Canadian crutch" in his right arm and a lumbosacral orthotic brace on his right knee, that the crutch was necessary for Rosado to use in all types of terrain, that Rosado either used the

walls or required someone's assistance for support as well, and that he needed some kind of an assistive device. *Id*. However, Rosado had no limitations as to his hand functioning. Tr. 808. Rosado's back extension, back flexion, and lateral flexion were all limited as well, though his neck and hips were not in any regard. Tr. 809. On the same day, radiologist Dr. Samuel Garau Diaz performed imaging on Rosado's cervical spine and lumbosacral spine, but all of his findings were unremarkable. Tr. 811.

On December 19, 2019, Rosado complained to nurse practitioner Olga Maldonado-Gonzalez of lower back pain episodes yet again. Tr. 923. Her findings were largely normal except that she found that Rosado had joint pain or swelling. Tr. 924. His BMI was 32.7. *Id*.

On February 13, 2020, Dr. Milagros Arroyo-Rivera noted that Rosado had been treated with physical therapy and intramuscular injections in the past and that he had had a spinal block performed on him in 2018 with little benefit. Tr. 1024. His lower back pain level apparently remained unchanged. *Id*.

A hearing before the ALJ took place on March 9, 2020. Tr. 38. Rosado testified that in December 2016 he was training to jump out of planes via parachute, but pulled his ripcord too late during a jump due to fog and hit the ground with some force; he attributes the initial cause of his back pain to this accident. Tr. 44-45. He said that he had to stop working because it is hard for him to remain standing, he cannot bend much due to lower back pain, and while in the army he could not exercise or run because his legs would fall asleep. Tr. 44. While in the army still he apparently had two weeks of physical therapy and two injection procedures on his spine after his parachuting incident. Tr. 45. He then began going to a Veterans Affairs hospital to receive treatment and was still receiving treatment there at the time of the hearing. *Id*.

Rosado explained that his back pain has radiated to his right leg and that this makes it hard for him to stand or walk for more than ten to fifteen minutes; he also noted that he uses a crutch that he was prescribed while in the army at all times in order to help him walk and balance. Tr. 45-46. He then testified that he has trouble sitting for more than fifteen to twenty-five minutes without getting up. Tr. 47. He went on to note that he can no longer lift up his child, who weighs around twenty-five to thirty pounds, and that he generally has trouble lifting and carrying things due to his condition. Tr. 47-48. Rosado testified that he was under treatment for an emotional condition, that he missed his time in the army dearly, that he was emotionally frustrated by his inability to fully interact with his children in the ways that he would like to, and that he felt a lot of anger as a result that would lead to arguments with his wife in particular. Tr. 48-50. He stated that he typically did little to nothing during the day and that he had had a car accident because his leg fell asleep and he hit another vehicle. Tr. 52. He also testified that he took on a contract position as a security guard for a month in May 2018 that required him to do rounds at a school in his car, but that they did not renew his contract because his employers needed him to do more than just make the rounds and because they feared that something bad might happen (seemingly due to his condition). Tr. 53. Rosado claimed that when his leg would have issues, the whole leg would fall asleep and the soles of his feet would tingle; the leg would apparently also go numb completely. Tr. 54.

Dr. Jorge Hernandez-Denton ("Dr. Hernandez"), a medical expert with expertise in internal medicine and gastroenterology in particular, then testified as to Rosado's condition and whether or not he might be disabled. Dr. Hernandez noted that although Rosado had mild to moderate arthritis and mild disc bulging in parts of his spine, he had no central canal stenosis, no neural foraminal stenosis, no evidence of pinched nerves, and no evidence of a fracture in any of his vertebrae. Tr. 55. He stated that while Rosado had a recent straight leg raise test that was positive,

he had had multiple negative straight leg raise tests in the past, the most recent result was very mild, and he otherwise had no evidence of motor deficit or sensory deficit. *Id*. He went on to say that although Rosado reported lumbar pain, but that x-rays of his lumbar region and other parts of his body were normal. Tr. 55-56. Dr. Hernandez stated that while Rosado was technically slightly obese, he was also a "strong man" and a "muscular person." Tr. 56-57. He concluded that Rosado did not meet either Listing 1.02 or 1.04 and that he could lift, pull, push, and carry ten pound occasionally and less than ten pounds frequently; sit for about six hours during an eight-hour shift; and stand or walk for about two hours of an eight-hour shift. Tr. 57.

Dr. Hernandez then went on to say that he did not believe that Rosado needed to use an assistive device for walking on plain surfaces, and in fact most likely only needed a cane or crutch during moments of imbalance in order to feel secure, though he noted that he was not aware if there was an emotional component to Rosado's use of an assistive device when ambulating or if his condition was solely physical. Tr. 58. He also noted that the only objective finding regarding Rosado's leg issue is the straight leg test that resulted in a mild positive finding, leading him to believe that the condition might be largely emotional instead of physical. Tr. 61. He stated that Rosado had no postural limitations; that he could not climb scaffolds but could occasionally climb ramps or stairs; that he could balance frequently; that he could kneel, crouch, and crawl occasionally; that he had no reaching limitations; and that he could occasionally drive, be around mechanical parts, and be around vibrations. Tr. 61-62. Dr. Hernandez then noted yet again that he would have liked to see "the emotional part" of the case regarding Rosado's use of an assistive device for balance and support. Tr. 65. He went on to state that the medical findings indicate that Rosado uses the device for "guarding" or protecting himself, that he had no abnormal gait, and that his muscle strength is normal. Tr. 67.

A vocational expert then testified, noting in response to a question from Rosado's counsel that an individual who had to use an assistive device to walk at all times or who could not sit or stand for more than an hour without taking a fifteen-minute break would not be able to perform the jobs ultimately cited by the ALJ in his determination as jobs that Rosado could have performed. Tr. 73. His testimony is not otherwise pertinent to the allegations in this matter.

The ALJ issued his determination on April 3, 2020. Tr. 32. The ALJ noted that Rosado last met the insured status requirement on March 31, 2019 and that he had not engaged in any substantial gainful activity from his alleged onset date of May 31, 2018 through his date last insured. Tr. 23. The ALJ then found that Rosado had the severe impairments of obesity, major depressive disorder, and degenerative disc disease of the lumbar spine. *Id*. However, the ALJ did not find that Rosado had an impairment or combination of impairments that met or medically equaled the severity of an impairment from the Social Security listings despite evaluating Listings 1.02, 1.04, and 12.04. Tr. 24. In regards to Listing 12.04, the ALJ found that Rosado had a moderate limitation when it came to understanding, remembering, or applying information; a mild limitation in interacting with others; a moderate limitation regarding his ability to concentrate, persist, or maintain pace; and a mild limitation as to his ability to adapt or manage himself. Tr. 24-25. The ALJ also found in regards to the same listing that Rosado had more than a minimal capacity to adapt to changes in his environment or demands not already a part of his daily life because he had not lived in a highly supportive living environment or been hospitalized for psychiatric treatment or care. Tr. 25. He therefore concluded that Rosado did not meet Listing 12.04.

The ALJ then concluded that Rosado had the RFC to perform sedentary work, but with the following additions and caveats: he could lift, carry, push, and pull ten pounds occasionally and less than ten pounds frequently; he could sit for six hours out of an eight-hour workday with normal

breaks; he could stand and walk for two hours total in an eight-hour workday with normal breaks; he needed a handheld assistive device known as "Canadian crutches" to help him during ascending or descending slopes, prolonged walking, and handling uneven terrain on foot; he could never climb scaffolds, ladders, or ropes; he could climb ramps and stairs occasionally; he could balance frequently, stoop occasionally, kneel occasionally, crawl occasionally, and crouch occasionally; he could never work at unprotected heights; he could only occasionally work around moving machine parts, tolerate exposure to vibrations, or operate a motor vehicle; he could perform simple and repetitive tasks, maintain concentration, maintain persistence, and maintain pace for eight-hour workdays five days a week despite some mental limitations; and he could understand, remember, and carry out simple instructions and deal with changes in the simple work setting despite some mental limitations. Tr. 25-26.

In reaching his determination regarding Rosado's RFC, the ALJ noted (among other things) that the record indicated that Rosado was obese and that his BMI was 30.7, which would put him at Level I (BMI of 30-34.9) for obesity out of three levels, Rosado's BMI being at the lowest level and thereby putting him at the least risk for developing obesity-related impairments. Tr. 27-28. The ALJ also noted that obesity can cause limitation of function, that there is no listing for obesity, that obesity could lead to a wide variety of limitations, and that the combined effects of other impairments and obesity could lead to those impairments being worse than they would be otherwise. Tr. 28.

The ALJ then went on to evaluate medical opinions and medical findings, noting that he found Dr. Hernandez's opinion highly persuasive because he was a specialist familiar with Social Security policy and regulations, he based his opinion on a longitudinal review of the record, and he provided a detailed explanation with references to the evidence in the record to support his

opinion. Tr. 29. The ALJ also noted that he adopted the limitations suggested by Dr. Hernandez in their entirety. *Id*. The ALJ found Dr. Egozcue's opinion persuasive because it was supported by Dr. Egozcue's personal medical findings. *Id*. The ALJ found Dr. Rivera's opinion less persuasive than the other two, however, because it was based on a one-time evaluation and the ALJ felt that Rosado had greater limitations than those suggested by Dr. Rivera; he found similarly in regards to the opinions of the government medical consultants because they did not have the opportunity to review the full record and did not appear to adequately consider the combined effects of Rosado's various impairments. Tr. 30.

The ALJ then noted that Rosado was unable to perform any past relevant work, but that there were jobs that he could perform that existed in significant numbers in both the national and the local economy. Tr. 30-32. However, the ALJ noted that a finding of "not disabled" was supported regardless and ultimately found accordingly. Tr. 31-32.

## DISCUSSION

As a preliminary matter, Rosado makes a cursory, offhand reference to the fact that he considers the ALJ's analysis of the listings to be flawed, but he does not explain why or how. *See, e.g.*, *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). Although I have looked over the ALJ's analysis of the listings within the section designated for that analysis and would consider his analysis of Listings 1.02 and 1.04 to be inadequate in isolation (though his analysis of Listing 12.04 appears to be more than sufficient), the ALJ notes that his analysis of the listings is consistent with his "findings below," which includes the ALJ's RFC determination for Rosado. The RFC determination clarifies the ALJ's determinations as to the listings and suggests that his view of the evidence as far as the listings go is substantially supported,

so at most his cursory analyses of Listings 1.02 and 1.04 would appear to amount to harmless error. Regardless, as a result of Rosado's failure to develop even the outline of an argument on this point, I deny any claim made by Rosado as to the listings.

Rosado also claims that the ALJ's RFC determination is flawed. Rosado bases this claim almost entirely on the premise that the ALJ relied too heavily on testimony given by Dr. Hernandez at the hearing before the ALJ regarding Rosado's ability to ambulate[1] and that Dr. Hernandez's testimony was ill-founded and contained errors.

Contrary to Rosado's claims, Dr. Hernandez's opinion is well-founded and well-supported by numerous citations to the medical record. The ALJ also acted reasonably when choosing to favor Dr. Hernandez's opinion, justifiably noting that Dr. Hernandez is a specialist familiar with SSA policy and regulations who based his opinion on a longitudinal review of the record and provided a detailed explanation to support his opinion. Tr. 29. Rosado makes much of the fact that Dr. Hernandez's opinion conflicts with Dr. Rivera's opinion to an extent, but the ALJ clearly and rationally explained his reasons for favoring Dr. Hernandez's opinion over Dr. Rivera's, including noting that Dr. Hernandez was able to examine the entire medical record instead of only seeing Rosado for a single appointment as Dr. Rivera did. Furthermore, while Rosado implies that the ALJ actually relied entirely upon Dr. Hernandez's opinion, Rosado cited the record at length in reaching conclusions regarding Rosado's RFC. For example, such citations include noting that Rosado could watch television, shop, and manage his funds. Tr. 26. The ALJ also said that certain of Rosado's straight leg raising tests were negative bilaterally; that he had no evidence of clubbing,

---

[1] Rosado's ability to ambulate is relevant because even though the ALJ found that Rosado was limited to sedentary work, such work still requires an individual to have the ability to walk occasionally. "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567. *See also* Tr. 73 (the vocational expert stating that that an individual who had to use an assistive device to walk at all times would not be able to perform the jobs cited by the ALJ in his determination).

cyanosis, or edema; that he had adequate muscle tone; and that imaging of his lumbosacral spine revealed normal bone density and architecture, his vertebral bodies maintained their normal height and shape, and his intervertebral spaces were well-preserved. Tr. 27. The ALJ noted further on that the record did not show evidence of aggressive or invasive treatment for Rosado's conditions or surgery recommendations and that Rosado's overall condition was noted to be "good." *Id*. The ALJ applied all of these conclusions in determining that the medical findings did not support Rosado's allegation that he is unable to work. The ALJ also provided many other citations to the record and relied in part on the testimony of experts and treating physicians in reaching an RFC determination, including but not limited to Dr. Hernandez, while at the same time providing reasoned analysis as to the weight he gave to each opinion. Rosado's claim that the ALJ failed to explain his conclusions thus has no merit.

Rosado also notes that Dr. Hernandez suggested that psychiatric or psychological aspects of Rosado's condition may or may not be greater factors as to his difficulties with ambulation than his physical symptoms are. I note at the outset that, as Dr. Hernandez himself has said, he is not a psychiatrist, so this suggestion must be taken with a grain of salt. However, mental and emotional distress or other primarily psychological conditions can, of course, produce physical responses that could be severe enough to warrant an individual obtaining disability, particularly in combination with already existing, medically determinable physical symptoms. *See, e.g., Thompson v. Astrue*, 764 F.Supp.2d 1132, 1142 (D. Minn. 2011) (remanded due to the ALJ's failure to consider the plaintiff's mental and physical symptoms together where the medical expert testified only to the plaintiff's physical symptoms and the record suggested there was interplay between mental and physical symptoms); *Dross-Swart v. Astrue*, 872 F.Supp.2d 780, 795 (N.D. Ind. 2012) (remanding in part because the ALJ failed to take into consideration the combination or aggregate effect of the

plaintiff's impairments because the ALJ separated her mental and physical symptoms). The ALJ therefore could have erred if he failed to consider evidence supporting the notion that Rosado's mental or emotional condition had an effect upon his ability to ambulate when determining that he had the capacity to sit for an extended period of time or walk on level, even ground without the aid of an assistive device.

In practice, however, the ALJ clearly thoroughly considered Rosado's mental condition when determining Rosado's RFC, but objective evidence suggesting that Rosado's mental or emotional condition negatively affected his ability to ambulate simply does not exist. While Dr. Hernandez placed some stress on the fact that he would have liked to see more evidence regarding Rosado's mental and emotional state, the ALJ evaluated a good deal of evidence from the record fitting this description when crafting the RFC determination; however, review of the record reveals that evidence suggesting that Rosado's mental or emotional state affects his ability to ambulate is minimal or nonexistent. Moreover, it is possible to infer from the record that Rosado's mental and emotional condition would be unlikely to have a severe effect upon this ability; for instance, the ALJ reasonably found via citations to the record that Rosado only had mild limitations when it came to adapting and managing himself, which suggests that his mental condition would be unlikely to have an outsized effect upon his ability to manage normal, day-to-day activities like walking. While Rosado did provide evidence that caused the ALJ to conclude that he had severe major depressive disorder, a mental impairment, the ALJ also found that this disorder did not meet the level of a listing, and the ALJ thoroughly covered the record as to Rosado's mental and emotional status in his opinion. It is, of course, Rosado's burden to show that he has a disability at Steps One through Four (which include the RFC determination) by providing evidence to this effect, but he has not provided evidence showing that he cannot walk without the aid of an assistive

device due to his mental or emotional state, nor has he even attempted to identify where such evidence might be found in the record upon appeal. As a result, remand for the purpose of determining whether Rosado's mental or emotional state had an effect upon his ability to ambulate would be unnecessary and futile.

Before turning to Rosado's final claim, when determining Rosado's RFC the ALJ characterized also Rosado as being "more limited" in his abilities than Dr. Rivera's opinion provided for; however, in practice Dr. Rivera appears to have found more limitations in regards to Rosado's ability to ambulate than the ALJ did. For instance, Dr. Rivera found that Rosado would have to use an assistive device to walk at all times, whereas the ALJ ultimately found that he would not need to use such a device to walk on even, level terrain. The ALJ thus erred in his characterization of Dr. Rivera's findings.

Nonetheless, this error is harmless. It is fairly clear that the ALJ would not have given Dr. Rivera's opinion greater weight even if he had characterized Dr. Rivera's findings correctly; the primary reason that the ALJ lists for finding Dr. Rivera's opinion "less persuasive" is that it was only based on a one-time evaluation (as opposed to a longitudinal look at the medical record). In fact, it is entirely possible that the ALJ wrote that Rosado was "more limited" than Dr. Rivera's opinion provided for when he actually meant that he was "less" limited; the ALJ's analysis of Dr. Rivera's opinion would make sense either way. Furthermore, the record as a whole does reflect that Rosado was less limited in his ability to ambulate than Dr. Rivera's opinions suggest; as Dr. Hernandez notes, there is little to no evidence that Rosado had any particular difficulty walking without the aid of an assistive device on even, level terrain besides Rosado's subjective statements, and in fact there is almost no actual medical evidence that he had motor or sensory deficits. As a result, the ALJ's incorrect characterization of Dr. Rivera's opinion is harmless.

Finally, Rosado argues that the ALJ failed to adequately consider the fact that Rosado is obese when he determined that Rosado is not disabled. As Rosado acknowledges, the ALJ spent at least two paragraphs of the opinion evaluating Rosado's obesity and also found that Rosado's obesity constituted a severe impairment, so the ALJ did explicitly consider Rosado's obesity when making his disability determination. The only question remaining is therefore whether the ALJ's analysis was sufficient.

This is a somewhat closer question than it appears to be at first glance. While the ALJ did acknowledge Rosado's obesity and go into some detail about obesity generally as well as Rosado's condition, considering that the ALJ found that Rosado's obesity did in fact constitute a severe impairment, ideally I would expect to see more detailed analysis that delved more into the specifics of how Rosado's obesity affected his other impairments (if at all), even despite Rosado's failure to identify any specific evidence in the record as to how his obesity affects his other impairments. *See, e.g.*, *Kaylor v. Astrue*, No. 2:10-CV-33-GZS, 2010 WL 5776375, at *3 (D. Me. Dec. 30, 2010) (noting that despite the plaintiff's failure to identify how his obesity affected his other impairments, "[t]he administrative law judge's determination that the plaintiff's obesity was severe necessarily meant that *she* independently found it to impose work-related functional limitations. . . . In the absence of any meaningful specification of those limitations, it is impossible to determine whether she incorporated them into her RFC determination or whether their absence, if any, from that determination was harmless error").

However, I find that any potential error on the part of the ALJ regarding Rosado's obesity was harmless. The ALJ discusses Rosado's obesity in greater detail than the ALJ in *Kaylor* apparently did, finding for instance that his obesity was only at the first out of three levels that lead to progressively worse potential consequences and further noting that his BMI was towards the

low end of this first level. Moreover, when determining Rosado's RFC the ALJ cites and relies in part upon the opinions of medical experts who considered Rosado's obesity in combination with his other impairments but found that Rosado did not have a disability. *See, e.g.*, *Newell v. Colvin*, No. 12-CV-480-S, 2014 WL 546761, at *6 (D.N.H. Feb. 10, 2014) ("As various courts (including this one) have noted, even when an ALJ fails to specifically discuss a claimant's obesity (not the case here), it is sufficient if he or she relies upon the opinions of medical experts who have taken the claimant's obesity into consideration"). Finally, as Dr. Hernandez implicitly noted at the hearing before the ALJ, though Rosado is technically obese, the record also reflects that he is a muscular person who might be less likely to suffer adverse health consequences as a result of his size than a person with a higher percentage of body fat would, even when considering his condition in combination with the other impairments he alleges. The record simply does not reflect that Rosado's obesity affected either him or his other symptoms in any significant way. As a result of the above factors, if the ALJ committed an error in his analysis of Rosado's obesity, that error was harmless.

## CONCLUSION

For the foregoing reasons, the ALJ's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 29th day of March 2022.

S/ *Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge